IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>          Plaintiff, )<br>)<br>          v. )<br>)<br>BOLLINGER SHIPYARD, INC., BOLLINGER )<br>SHIPYARDS LOCKPORT, LLC, AND HALTER )<br>BOLLINGER JOINT VENTURE, LLC, )<br>)<br>          Defendants. )<br>) | Civil Action No. _____ |

## UNITED STATES' COMPLAINT

1.  The United States brings this action against defendants Bollinger Shipyard Inc., Bollinger Shipyards Lockport, LLC, and Halter Bollinger Joint Venture, LLC, (collectively referred to as "Bollinger"), pursuant to the False Claims Act (FCA), 31 U.S.C. § 3729 *et seq.* Bollinger knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims, in violation of the FCA. Bollinger knowingly misled the Coast Guard to enter into a contract for the lengthening of Coast Guard cutters by falsifying data relating to the structural strength of the converted vessels. Eight Coast Guard cutters are now unseaworthy and unusable.

## PARTIES

2.  Plaintiff is the United States of America. The Coast Guard is an armed force of the United States, responsible for protecting the maritime economy and environment, and defending our maritime borders. The Coast Guard was the contracting agency for the acquisition at issue in this matter.

3.  Defendant Bollinger Shipyards, Inc. (BSI) is a Louisiana corporation with a

mailing address of P.O. Box 250, Lockport, LA 70374.

4. Defendant Halter-Bollinger Joint Venture, LLC (HBJV), is a Louisiana limited liability company with a mailing address of P.O. Box 250, Lockport, LA 70374. HBJV's members are VT Halter Marine, Inc., 900 Bayou Casotte Parkway, Pascagoula, MS 39581, and Bollinger Shipyards Lockport, LLC, 8365 Highway 308 South, Lockport, LA 70374-0250.

5. Defendant Bollinger Shipyards Lockport, LLC (BSL), is a Louisiana limited liability company with a mailing address of P.O. Box 250, Lockport, LA 70374. BSL's single member is Bollinger Shipyards, Inc., 8365 Highway 308 South, Lockport, LA 70374.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and l345.

7. This Court may exercise personal jurisdiction over defendants pursuant to 31 U.S.C. § 3732(a), because defendants transact business in the District of Columbia.

8. Venue is proper in the District of Columbia under 31 U.S.C. § 3732 and 28 U.S.C. § 1391(b) and (c) because defendants have transacted business in this District and have committed acts proscribed by 31 U.S.C. § 3729 in this District.

## STATUTORY AND REGULATORY FRAMEWORK

### The False Claims Act

9. The FCA, 31 U.S.C. §§ 3729-3733, provides for the award of treble damages and civil penalties for, inter alia, knowingly causing the submission of false or fraudulent claims for payment to the United States Government, or knowingly using a false record or statement material to a false claim. 31 U.S.C. § 3729(a)(1)(2008) and (a)(1)(B)(2009). During the relevant

time period, the FCA provided, in pertinent part, that any person who:

> (a) (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; [or]
>
> (a)(1)(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;[1]
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000 plus 3 times the amount of damages which the Government sustains because of the act of that person. . . .
>
> * * * *
>
> For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information, (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

31 U.S.C. §3729(a)(1)(2008) and (a)(1)(B)(2009).

10.     Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 64 Fed. Reg. 47099, 47103 (1999), the FCA civil penalties were adjusted to a range of $5,500 to $11,000 per false claim for violations occurring on or after September 29, 1999.

## FACTS

11.     In 1999, the Coast Guard began a two-phased program, known as Deepwater, to replace its fleet of water vessels, aircraft, and electronics systems.  The Deepwater program was

---

[1] The False Claims Act was amended pursuant to Public Law 111-21, the Fraud Enforcement and Recovery Act of 2009 (FERA), enacted May 20, 2009.  Section 3729(a)(1)(B) was formerly Section 3729(a)(2), and is applicable to this case by virtue of Section 4(f) of FERA, while Section 3279(a)(1) of the statute prior to FERA, and as amended in 1986, remains applicable here.

pursued as a "system-of-systems" acquisition under which a combination of vessels, aircraft, and information systems would be procured in a single integrated package. The Coast Guard determined that a private-sector lead system integrator (LSI) would be responsible for designing, building, and integrating the elements to meet its operational requirements. The LSI would have sole responsibility for design, engineering, and production of the various assets and sub-systems. In Phase 1 of the Deepwater program, three industry teams competed for a contract to replace Coast Guard assets, including small vessels known as cutters.

12. Based on the Phase 1 submittals, the Coast Guard selected Integrated Coast Guard Systems (ICGS), an entity formed by Lockheed Martin Corporation (LMC) and Northrop Grumman Ship Systems, Inc. (NGSS), n/k/a Huntington Ingalls, Inc., to proceed as the lead systems integrator under a contract for Phase 2.

13. Part of the proposal submitted by ICGS was the proposed modification of existing 110-Ft Patrol Boats (WPBs) into 123-Ft WPBs, incorporating a 13-foot extension to the 110-Ft cutters used successfully by the Coast Guard for years. NGSS' subcontractor, Bollinger, which had built the 110-Ft WPB fleet, was responsible for the design, engineering, performance requirements, and construction of the 123-Ft WPBs.

14. The purposes of the conversion of the 110-Ft WPBs were to extend the service life of the vessels, increase annual operating hours, add command, control, communications and computer capabilities, and provide a new boat recovery and launching ramp.

15. During Phase 1, the Coast Guard raised concerns about the feasibility of the conversion of the 110-Ft WPBs to 123-Ft WPBs, in particular the structural integrity of the 123-Ft WPB hulls in light of the proposed 13-foot extension of the vessels. On September 27, 2000,

the Coast Guard notified ICGS and Bollinger "that lengthening the vessel will increase primary stress in the hull girder, but that no analysis has been performed to investigate if the increase in hull girder bending moment will be acceptable." ICGS and Bollinger were notified that the sources of the Coast Guard's concern included the "significant hull degradation" of the 110-Ft WPBs.

16. On October 3, 2000, Bollinger prepared a longitudinal strength analysis in response to the Coast Guard's structural integrity concerns. Bollinger's chief naval architect stated internally that its hull design exceeded the standards contained in the 1997 American Bureau of Shipping (ABS) Guide for Building and Classing High Speed Craft (ABS HSC 1997) by a factor greater than two. Bollinger's analysis included calculations comparing the actual section modulus of its design, a measure of its longitudinal strength, with the minimum required section modulus, in accordance with ABS HSC 1997 part 3, section 6, to demonstrate that the design provided the necessary longitudinal strength to alleviate the Coast Guard's concerns.

17. Bollinger used the Midship Section Calculator (MSC) program to calculate the actual section modulus. The MSC software allows for modeling of a ship's hull and calculates its section modulus using references to structural shape properties. A library of common structural shapes is provided with the application and custom structural shapes and shape properties can be added. The software user is directly involved in inputting structural shapes, structural shape physical and engineering properties, hull form, and shell plate material and thickness.

18. On October 3, 2000, Bollinger submitted to the Coast Guard a longitudinal strength analysis stating that "the required section modulus is 3113 [inches cubed] and the actual

section modulus of the patrol boat is 7152 [inches cubed]." This statement indicated to the Coast Guard that Bollinger's design for the 123-Ft WPBs included a safety factor of 2.3 times the ABS required section modulus. Bollinger obtained the section modulus values reported to the Coast Guard in Phase 1 by using thicker hull plating in its design calculation than existed in the 110-Ft WPBs at that time. Bollinger did not tell the Coast Guard that it had used thicker hull plating in its calculations. Since there was no provision in the proposal for replacing the hull plating on the 110-Ft WPBs with thicker hull plating during the conversion, using this thicker hull plating in the calculations was not reasonable.

19. On August 7, 2001, during Phase 1, Bollinger was advised by email from a NGSS predecessor that the ICGS contract required "the Contractor shall use the American Bureau of Shipping (ABS) to certify compliance with ABS standards."

20. At the completion of Phase 1, the Coast Guard selected ICGS to proceed under contract in Phase 2, in part because of its proposed modification of the 110-Ft WPBs. The Coast Guard relied upon Bollinger's representation of sufficient structural hull strength in accepting Bollinger's design and awarding the Deepwater Phase 2 contract to ICGS.

21. The Coast Guard and ICGS entered into Contract No. DTCG23-02-C-2DW001 on June 25, 2002. The ICGS contract contained a Contract Data Requirements List (CDRL), which identified information that ICGS and its subcontractors were required to provide the Coast Guard concerning the assets and other contract deliverables. Section E.3.1 of the ICGS contract provided, in part, that

> Final deliverables shall accurately represent the delivered condition of each asset.

The contract required ICGS and its subcontractors to provide the Coast Guard with CDRL S012-11, a Hull Load and Strength Analysis (HLSA), to verify that the 123-Ft WPB modification design met program and contract requirements.

22.     In August 2002, the Coast Guard awarded the first of four Delivery Task Orders (DTOs) under the ICGS contract for the design and modification of eight 123-Ft WPB cutters. The 123-Ft WPB DTOs were awarded on a firm fixed-price basis. The scope of work in the first DTO was identified in the ICGS contract as Contract Line Item Number (CLIN) 55D, and described as "Detail Design and Construction for Major Modification of 110/123 Class Patrol Cutter Lot I Lead Ship." The three additional DTOs, incorporating the same design, were subsequently issued to Bollinger in May and August 2003.

23.     In late August 2002, prior to submission of CDRL S012-11, Bollinger's chief executive officer, Boysie Bollinger, exchanged emails with Bollinger vice president T.R. Hamblin concerning review of Bollinger's design by ABS. On August 26, 2002, CEO Bollinger advised Hamblin, and other Bollinger officials, that ABS' Robert Kramek, a former Coast Guard Commandant, had offered to review the hull design for the converted vessel. CEO Bollinger stated that ABS would provide a "confidential assessment." Bollinger requested the views of Hamblin and the other recipients as to whether to accept ABS' offer.

24.     Hamblin's response reflected a concern that the ABS review would find that the 123-Ft WPB design would require additional structure or structural support. The recommendation provided to CEO Bollinger was to decline ABS' offer to conduct a review of the hull design for the converted vessel.

25.     On August 27, 2002, CEO Bollinger replied that:

> I'm concerned that [Kramek] sells CG on the fact that they need this review. . . . [ABS] would love the additional responsibility from the CG and as we both know, adverse results could cause the entire 123 to be an un-economical solution if we had to totally rebuild the hull. . . . MY CONCERN - we don't do anything - ABS gets CG to require it without our input, and the result is we BLOW the program.

Thus, CEO Bollinger indicated that Hamblin should take steps to avoid ABS review of the design of the complete hull.

26. On or about the same date, August 27, 2002, an unidentified Bollinger employee performed a series of calculations of the 123-Ft WPB section modulus. Bollinger found that the actual section modulus, without an increase in hull plating, was far less than the 7,152 cubic inches reported to the Coast Guard during Phase 1, and less (under two of the calculations) than the 3,113 cubic inches reported previously as the minimum requirement. Bollinger ran the MSC application at least three times, changing input data, and obtained results of 2836, 3037 and 5,232 cubic inches.

27. On August 28, 2002, NGSS authorized HBJV to proceed with the work in CLIN 55D, "in anticipation of definitizing a Firm Fixed Price - type contract by 30 September 2002."

28. On or about August 30, 2002, Bollinger drafted a version of CDRL S012-11 that included its calculation results showing a section modulus of 3,037 cubic inches, one of the three calculated values. This version was not submitted to the Coast Guard.

29. On September 4, 2002, Bollinger submitted to the Coast Guard an initial CDRL S012-11 that reported an actual section modulus of 5,232 cubic inches, the highest of the calculated values. To obtain this result Bollinger changed the physical properties of the shape files included in the MSC model. Bollinger entered data into the MSC program that did not

reflect the actual structural characteristics of the converted vessels.

30. Bollinger's applicable quality assurance procedures required that calculations be checked and reviewed by management before submittal. The CDRL S012-11 submitted to the Coast Guard stated that a naval architect performed the HLSA calculations, that Bollinger's chief naval architect checked the HLSA calculations, and that a Bollinger vice president reviewed the CDRL and approved its release to the Coast Guard. Bollinger did not report any of the lower actual section modulus results, 2836 and 3037 inches cubed, to the Coast Guard.

31. On October 9, 2002, Bollinger met with the Coast Guard in a Preliminary Design Review meeting. In response to the Coast Guard's continuing concerns about the structural integrity of the converted cutters, Bollinger told the Coast Guard that ABS would review the midship section modulus calculation and longitudinal strength. Bollinger never requested ABS review of the midship section modulus calculation and longitudinal strength, and ABS did not perform this review.

32. On December 16, 2002, Bollinger submitted its final version of CDRL S012-11, signed by the same Bollinger officials as in September 2002, reporting that the actual section modulus was 5,232 cubic inches.

33. On December 18, 2002, Bollinger held a Critical Design Review (CDR) meeting with the Coast Guard. At the CDR, Bollinger informed the Coast Guard that ABS had been engaged to review compliance with ABS rules. ABS did not review or certify Bollinger's longitudinal strength calculations or calculation of the 123-Ft WPB actual section modulus.

34. In March 2004, the first 123-Ft WPB, the USCGC MATAGORDA, was delivered and accepted, followed by payment by the Coast Guard.

35. On August 20, 2004, a Bollinger vice president signed CDRL S016, certifying compliance with applicable contract requirements.

36. On September 10, 2004, the Coast Guard cutter MATAGORDA suffered a structural casualty that included buckling of the hull. An investigation by the Coast Guard and ICGS into the cause of the casualty found that Bollinger's S012-11 calculations overstated the actual section modulus depicting the longitudinal strength of the hull. Bollinger recalculated the actual section modulus, using the MSC software, and reported that the true section modulus was 2,615 cubic inches. On October 13, 2004, Bollinger vice president Hamblin stated in an internal email to CEO Bollinger and others that:

> . . . we did lead the CG into a false sense of security by telling them early on that the Section Modulus for a 123 would be 5230 [sic] inches cubed as opposed to the real number, just above 2600.

37. In total, eight 123-Ft WPBs were delivered to the Coast Guard by Bollinger, through ICGS. None of the vessels possessed the longitudinal strength represented by Bollinger in the CDRL S012-11s submitted in September and December 2002. Efforts to increase the longitudinal strength of the vessels were made by ICGS and the Coast Guard after the MATAGORDA's failure; these efforts did not increase the longitudinal strength to the level represented by Bollinger in its CDRLs. The modified cutters are now unusable. Had the Coast Guard been aware of the true section modulus at the time it issued the DTOs, it would not have proceeded with Bollinger's design for the modification of the 110-Ft WPBs.

38. Between November 22, 2002 and December 26, 2006, or soon thereafter, the Coast Guard paid ICGS approximately $78 million in response to 65 requests for payment by ICGS to the Coast Guard under the four DTOs for the work performed by Bollinger. The Coast

Guard was also damaged by the loss of the eight now-unusable 110-Ft WPBs unsuccessfully modified by Bollinger, and other costs and losses resulting from Bollinger's actions.

39.   Bollinger and the United States executed a statute of limitations tolling agreement, and extensions, effective December 5, 2008.

**FIRST CAUSE OF ACTION**

(False Claims Act: Making or Using False Record or Statement)
(31 U.S.C. § 3729 (a)(1)(B)(2009))

40.   The United States repeats and realleges each allegation in ¶¶ 1 through 39 as if fully set forth herein.

41.   Defendants knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims for payment or approval by the United States.

42.   By virtue of the false records or statements made by the defendants, the United States suffered damages and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

**SECOND CAUSE OF ACTION**

(False Claims Act: Presentation of False Claims)
(31 U.S.C. § 3729(a)(1)(2008))

43.   The United States repeats and realleges each allegation in ¶¶ 1 through 39 as if fully set forth herein.

44   Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the United States.

45.   By virtue of the false or fraudulent claims made by defendants, the United States suffered damages and therefore is entitled to multiple damages under the False Claims Act, to be

determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## THIRD CAUSE OF ACTION

(Common Law Fraud)

46.     The United States repeats and realleges each allegation in ¶¶ 1 through 39 as if fully set forth herein.

47.     This is a civil action brought by the United States against the defendants under the common law for fraud.

48.     Defendants made misrepresentations of material fact, with knowledge of their falsity and/or with reckless disregard for their truth, and with the intent that they be relied upon by the United States, to induce the United States to enter into the Phase 1 and Phase 2 contracts, proceed with orders under the Phase 2 contract, or accept the delivery of vessels that did not possess the structural characteristics represented by the Defendants.

49.     The United States had the right to rely upon these representations. Acting without knowledge of the falsity of these representations and in reliance upon defendant's misrepresentations, the United States accepted delivery of the vessels, paid false claims, and was damaged in an amount to be determined.

## FOURTH CAUSE OF ACTION

(Negligent Misrepresentation)

50.     The United States repeats and realleges each allegation in ¶¶ 1 through 39 as if fully set forth herein.

51.     This is a civil action brought by the United States against the defendants under the common law for negligent misrepresentation.

52. In the course of its business, defendants made false representations to the plaintiff. Defendants had a pecuniary interest in making the statements. Defendants owed a duty of care to see that it communicated truthful information to the plaintiff. Defendants failed to exercise reasonable care or competence in communicating the information to plaintiff. Defendants breached the duty of care owed to plaintiff by failing to exercise due care.

53. The plaintiff justifiably relied on the representations.

54. The plaintiff suffered a pecuniary loss as the proximate result of reliance upon the misrepresentations in an amount to be determined.

**FIFTH CAUSE OF ACTION**

(Unjust Enrichment)

55. The United States repeats and realleges each allegation in ¶¶ 1 through 39 as if fully set forth herein.

56. Defendants obtained payments from the Coast Guard in return for the delivery of unseaworthy vessels. As a result of these payments, the Defendants have been unjustly enriched at the expense of the United States, under circumstances dictating that in equity and good conscience the money should be returned, in an amount to be determined at trial.

**WHEREFORE**, Plaintiff demands judgment against the Defendants as follows:

A. On Plaintiff's Count One, False Claims Act, judgment against the Defendants, for treble its damages, for the number of civil penalties allowable by law, in an amount as the Court may determine between $5,500 and $11,000 for each violation, plus such other relief as the jury deems appropriate and just;

B. On Plaintiff's Count Two, False Claims Act, judgment against the Defendants, for

treble its damages, for the number of civil penalties allowable by law, in an amount as the Court may determine between $5,500 and $11,000 for each violation, plus such other relief as the jury deems appropriate and just;

      C.      On Plaintiff's Count Three, Common Law Fraud, for damages in an amount to be determined, together with punitive damages, costs and interest;

      D.      On Plaintiff's Count Four, Negligent Misrepresentation, for damages in an amount to be determined, together with costs and interest;

      E.      On Plaintiff's Count Five, Unjust Enrichment, for damages in an amount to be determined, together with costs and interest;

      F.      And for all other and further relief as the Court may deem just and equitable.

      G.      For pre-judgment interest, post-judgment interest, fees and costs, as the jury deems appropriate and just.

                                                  Respectfully submitted,

                                                  TONY WEST
                                                  Assistant Attorney General

                                                  RONALD C. MACHEN JR., DC Bar #447889
                                                  United States Attorney

Dated: 7/29/2011                          /S/
                                                  DORIS COLES-HUFF (DC Bar # 461437)
                                                  Assistant United States Attorney
                                                  555 Fourth Street, NW
                                                  Washington, DC 20530
                                                  (202) 514-7170

Dated: 7/29/2011                          /S/
                                                  JOYCE R BRANDA (DC Bar #246363)
                                                  PATRICIA R. DAVIS (DC Bar # 390600)
                                                  ARNOLD AUERHAN  (DC Bar #417731)
                                                  Attorneys, United States Department of Justice
                                                  Civil Division
                                                  Ben Franklin Station
                                                  Post Office Box 261 (PHB 9130)
                                                  Washington, DC  20044
                                                  Tel:  (202) 307-0278
                                                  Fax:  (202) 514-0280

                                                  Attorneys for the United States